# EXHIBIT A

DC RAIL 22590200

## LEASE AGREEMENT

### TABLE OF CONTENTS

Page Number

1.  The Demised Premises.................................. 2

2.  Lease Terms and Renewal............................. 6

3   Rental and Other Payments........................... 7

4.  Covenants...........................................10

5.  Title to FOC Equipment and Facilities.............11

6.  Assignment and Sublease...........................12

7.  Right-Of-Way Operations...........................13

8.  Termination.......................................15

9.  Insurance.........................................18

10. Indemnification and Liability.....................22

11. Governmental Approvals and Related Matters........25

12. Force Majeure.....................................27

13. Exclusivity.......................................27

14. Notices...........................................28

15. Representations and Warranties....................29

16. Construction of the FOC System....................30

17. Liaison and Arbitration...........................36

18. Miscellaneous Matters.............................37

LEASE AGREEMENT

,acting as agent for Its Affiliated
Interexchange Carriers and the
American Telephone & Telegraph
Company - Interstate Division.
WSN/REC/P-1186

This Lease Agreement ("Agreement") is made and entered into as of the _3/st_ day of December, 1985, by and between the National Railroad Passenger Corporation (hereinafter referred to as "Lessor"), a District of Columbia corporation doing business as Amtrak, and AT&T Communications, Inc. (hereinafter referred to as "Lessee"), a Delaware corporation.

WHEREAS, Lessee desires to construct and operate a fiber optic communications system ("FOC System") along certain railroad right-of-way and within certain underground conduit controlled by Lessor ("the Right-of-Way"); and

WHEREAS, Lessee intends to use the FOC System constructed and operated along the Right-of-Way as part of a fiber optic communications system; and

WHEREAS, Lessor has previously leased portions of the Right-of-Way to other entities for fiber optic transmission and for other purposes; and

WHEREAS, Lessor is presently using part of the communications capacity of a fiber optic transmission system installed by others along Lessor's Right-of-Way for Lessor's own communication needs and for other purposes, including resale; and

WHEREAS, Lessee therefore understands that Lessor, and entities that have leased in the past, are currently leasing or may in the future lease portions of the Right-of-Way from Lessor, are now or in the future may be in direct competition with Lessee in the marketing of telecommunications capacity and services; and

WHEREAS, Lessor is willing to lease to Lessee certain Right-of-Way to allow Lessee to construct and operate an FOC System, in accordance with and as defined by the provisions of this Agreement;

NOW, THEREFORE, in consideration of the foregoing and of the mutual convenants and agreements hereinafter set forth, the parties hereto agree as follows:

1. The Demised Premises

1.1 Lessor hereby rents, demises and leases to Lessee, and Lessee hereby takes, hires and rents of Lessor, for the term, at the rental and upon the conditions, covenants, and agreements hereinafter set forth, the "Demised Premises," said Demised Premises to be used by Lessee for the sole purpose of construction, operation and maintenance by Lessee of an FOC System.  The Demised Premises shall include the Amtrak continuous railroad right-of-way from the Washington Terminal Company property adjoining Union Station, Washington, D.C. to 30th Street Station, Philadelphia, Pennsylvania, all as further defined in Attachment A attached hereto and made a part hereof, and shall further include access to underground conduit as available; where underground conduit is not available, access to land for direct burial of fiber and access to aerial or marine rights for fiber installation, all as available on or near the Right-of-Way; and access to land for Lessee to construct either buried or above ground repeater stations as needed, all as further described in Paragraph 1.2 herein.

- 2 -

1.2  **Lessee's** access to and right to use underground conduit shall include access to one duct within the underground conduit which now contains the Lessor's communications cable (hereinafter referred to as the "Existing Cable") for the removal of the Existing Cable; the cleaning and roping of the duct; the subducting of such duct; and the pulling of one fiber optic cable to be owned by the Lessee and one new communications cable, as described in the Communications Agreement between the parties, to be owned by the Lessor (hereinafter referred to as the "Local Distribution System"). Lessee's access to and right to use any land shall be limited to the installation of repeater stations, as specified in Paragraph 1.3 herein, installation of conduit and cable to access points off Right-of-Way and installation of electrical power lines where and to the extent repeater stations and electrical power lines are necessary to the construction or operation of the FOC System.

1.3  Land along or near the Right-of-Way that is adequate, suitable and available for repeater shelter sites shall be identified by the parties during the survey set forth in Paragraph 16.1 herein. The locations at which Lessee proposes to construct said repeater shelters shall be identified by the Lessee within ninety (90) days after completion of the survey specified in Paragraph 16.1 herein. Lessor, in its sole discretion, has the right to approve, reject, or change any or all of the locations proposed by the Lessee. To the extent Lessor makes land available for such purposes, Lessee shall construct said shelters and access at its own expense and at its

- 3 -

own risk, and Lessor shall not be responsible for conditions in and around said shelters that might adversely affect or cause damage to Lessee's shelters or to equipment. Lessee agrees that all shelters constructed by Lessee on property made available by Lessor shall be no larger than four hundred (400) square feet. Lessee further agrees that construction plans and specifications for the repeater shelters shall be approved by Lessor prior to commencement of construction, pursuant to Section 16 herein.

1.4  The FOC System is hereby defined as a fiber optic communications system using, as its exclusive transmission medium, a fiber optic cable of no more than forty-eight (48) fiber strands, associated repeaters and electronicters equipment, and electrical power supply. As used herein, the term "FOC System" shall not include, and the Demised Premises shall not encompass, any space or land at termination or other points of the FOC System for the performance by Lessee of functions commonly known in the telecommunications industry as "central office functions." The Demised Premises shall further not include any space or land along or adjacent to the Right-of-Way for the installation of any facilities or equipment for the performance or provision by Lessee of communications activities or services other than those necessary to the operation of the FOC System, as defined herein.

1.5  Lessee and its contractors, representatives, and agents shall have access at all times to the fiber optic cable, repeater shelters, electronic equipment, and electrical power lines on the Demised Premises, for the sole purpose of construction,

- 4 -

maintenance and operation of the FOC System, _provided_, _however_, that such access may not interfere with or disrupt in any way, other than in ways approved in advance by Lessor or its designated representative, the railroad and other operations conducted on the Right-of-Way by Lessor or third parties authorized to utilize the Right-of-Way, and _provided_, _further_, that such access shall at all times be subject to the notification provision of Paragraph 7.4 herein.

1.6  By leasing the Demised Premises, Lessor is not leasing, and this Agreement does not lease, to Lessee any right to use electrical power purchased by or available to Lessor for the operation of Lessee's FOC System.  Lessee shall be solely responsible for securing, purchasing, and paying for all electrical power used to construct, maintain, and operate the FOC System, whether such electrical power is used for normal operations of said system or for emergency purposes, and for construction and maintenance of electrical power lines, as specified in Paragraph 1.2 herein.

1.7  By leasing the Demised Premises, Lessor is not leasing, and this Agreement does not lease, to Lessee any right to use underground conduit and/or land for any purposes other than installation of the initial, single, fiber optic cable of no more than forty-eight (48) fiber strands and associated repeater shelters, electronic equipment, and power lines necessary to the operation of the FOC System.  Any replacement of said initial cable or supplementation of said initial cable with one or more additional cables along the Right-of-Way or on the Demised

- 5 -

Premises (other than replacement or supplementation necessitated by the failure of, or repair requirements with regard to, the initial fiber optic cable, which replacement or supplementation shall be made only upon prior, written notice to Lessor) shall be the subject of further, separate agreements between the parties.

1.8  Lessee understands and agrees that, while Attachment A contains Lessor's best current understanding of the Right-of-Way to which Lessor holds legal title or otherwise is in a position to lease to Lessee for FOC System purposes, it is possible that Lessor will not be able to lease certain limited portions of the Right-of-Way.  Any failure of Lessor to lease portions of the Right-of-Way specified in Attachment A shall not constitute a breach of this Agreement but shall be reflected in a pro rata reduction in rental payment, in accordance with Section 3 herein. In the event that Lessor is unable to lease to Lessee any portion of the Right-of-Way specified in Attachment A, Lessor shall cooperate with Lessee in seeking permission from the appropriate rights-holder to allow the FOC System to utilize said portions of the Right-of-Way.


2.    Lease Term and Renewal

2.1  The Demised Premises shall be leased to Lessee on the date of execution hereof, and this Agreement shall terminate at 12:01 a.m. on January 1, 2006 ("Initial Term"), unless this Agreement is renewed pursuant to the renewal provisions hereof.

2.2  Lessee shall have two options to renew and extend this Agreement for two "Renewal Terms" of twenty (20) years each.

- 6 -

Each option shall be exercisable by Lessee giving written notice
of renewal to Lessor no fewer than one hundred and eighty (180)
days prior to expiration of the Initial Term and of the first
Renewal Term, as the case may be.  Lessee's exercise of a renewal
option in accordance with the preceding sentence shall constitute
an irrevocable commitment on Lessee's part to renew the Agreement
for the specified Renewal Term.  If Lessee fails to exercise a
renewal option within the time period established by this
Paragraph, the option shall expire without any further action by
either party, and Lessor shall be free to lease Demised Premises,
or any portion thereof, to any other party upon expiration of the
Initial Term or the first Renewal Term, as the case may be.  The
leasing by Lessee of the Demised Premises for the first Renewal
Term shall be a condition precedent to Lessee's having an option
to renew this Agreement for the second Renewal Term.

### 3.    Rental and Other Payments

3.1  For the Demised Premises between Washington, D.C. and
Philadelphia, Pennsylvania, a distance of 134.79 miles, Lessee
agrees to pay a rental amount for the Initial Term of Fourteen
thousand one hundred eighty-five dollars ($14,185) per mile for
each mile of Right-of-Way which Lessor has the right to lease.
Lessee agrees to pay the entire rental amount specified in the
preceding sentence, regardless of whether Lessee actually makes
use of any portion of the Right-of-Way.  The payment for the
Initial Term shall be due and payable upon execution hereof.

- 7 -

3.2  All payments to be paid by Lessee under this Agreement shall be fully due and payable on the date specified or as set out in Paragraph 8.2 herein except for the lease payment which is payable pursuant to Paragraph 3.1 herein.  Lessee shall have no right to set-off against any payment due under this Agreement any sums which Lessee may believe are due to it from Lessor for any reason whatsoever.

3.3  For each Renewal Term as to which Lessee, pursuant to Paragraph 2.2 hereof, exercises an option to renew this Agreement, Lessee shall remit payment to Lessor on the first day of said Renewal Term.  Said payment shall be Twenty-five thousand dollars ($25,000) per mile of the FOC System, adjusted in accordance with the following provisions:

(a)  For purposes of this Agreement, "CPI" shall mean the Consumer Price Index for all urban consumers and all items, U.S. city average, 1967 Base of 100, issued by the Bureau of Labor Statistics of the U.S. Department of Labor.  If said Department (or its successor) ceases to use the 1967 Base of 100 as its basis of calculation, the parties shall appropriately adjust the CPI used for purposes of this Agreement to the figure that would have been arrived at had said Department (or its successor) not changed its manner of calculation.  If said Department (or its successor) shall cease to publish the CPI (or any substitute index), the parties shall select another, similar index published by a governmental or other neutral body, with appropriate reconciliation of the base of the substituted index with the base of the CPI;

(b)  The CPI as of January 1, 1986 shall be designated the Base Index;

(c)  After the end of the Initial Term or the first Renewal Term, as the case may be and as defined in Section 2 herein, the Renewal Term lease payment during the Renewal Term shall become the Initial Term lease payment or the first Renewal Term lease payment, as the case may be, multiplied by a fraction, the denomination of which is the Base Index and the numerator of which is the CPI for the last month prior to the end of the Initial Term or the first Renewal Term, as the case may be; and

(d)  No such adjustment shall reduce the Initial Term's lease payment or the first Renewal Term's lease payment, as the case may be.

3.4  Lease payments due from Lessee to Lessor hereunder shall be made by means of a wire transfer in immediately available federal funds to Lessor's account (account number 144-0-18699) at the Manufacturers Hanover Trust Company, 270 Park Avenue, New York, New York 10017, or to such other account as Lessor may from time to time specify in writing or in such other manner as is mutually acceptable to the parties.  Lessee shall notify Lessor immediately by means of a wire transmission, with confirmation by first-class, postage prepaid mail, when payment has been made.  All other payments due from Lessee to Lessor hereunder shall be duly identified, shall be made by a check drawn on a major United States bank, and shall be delivered to the Comptroller, National Railroad Passenger Corporation, Finance

- 9 -

Department, 400 North Capitol Street, N.W., Washington, D.C.
20001.

3.5  In the event that Lessee shall fail to pay, when due,
any amount payable by it under this Agreement, Lessee shall
become liable to Lessor for interest on the amount of such
payment for the period from the due date until the date of
payment at an annual rate of three (3) percentage points over and
above the rate announced from time to time by the Manufacturers
Hanover Trust Company at its offices in New York, New York, as
its prime commercial lending rate.  If a court of competetent
jurisdiction determines that any payment sought by Lessor is not
payable by Lessee, no interest shall be due.

4.    Covenants

4.1  Lessee agrees and covenants to pay all taxes, assess-
ments, use and occupancy taxes, charges for public utilities,
excises, levies, and the like, that are levied on Lessee's prop-
erty on the Demised Premises or that arise out of the construc-
tion, maintenance, or operation of the FOC System or the
construction of the Local Distribution System prior to transfer
of ownership to Lessor; including without limitation any such
taxes, assessments, and the like, or any increases in such taxes,
assessments, and the like, imposed on Lessor by virtue of the
construction, maintenance, and operation of the FOC System or the
construction of the Local Distribution System.  Lessor shall
provide to Lessee reasonable documentation in Lessor's possession
with regard to any taxes, assessments, and the like, or any

- 10 -

increases in such taxes, assessments, and the like, imposed on
Lessor and for which Lessee is responsible for payment pursuant
to the terms of this Paragraph.  Lessor, at its option, may
require Lessee to pay such taxes, assessments, and the like
directly to the appropriate governmental or other authority, or
Lessor may itself pay such taxes, assessments, and the like and
seek reimbursement from Lessee, which agrees to make such
reimbursement promptly.

4.2  Lessee agrees and covenants to pay such sums as may be
necessary to discharge liens and encumbrances filed with respect
to the Demised Premises for work, labor, services, goods,
materials, and the like supplied to Lessee or supplied to others
on Lessee's behalf.  Lessee shall have the right to contest in
good faith any liens or encumbrances referred to in this
Paragraph prior to being obligated to pay such sums as may be
necessary to discharge said liens and encumbrances.

4.3  Lessee and Lessor agree and covenant that this
Agreement does not permit Lessee to install a terminal facility
(Central Office) at any point along the Right-Of-Way.  Authority
for any such terminal facility must be the subject of a separate
contract.

5.  Title to FOC Equipment and Facilities

5.1  During the term of this Agreement (including any
renewals thereof), title to and ownership of all equipment and
facilities provided by Lessee to construct and operate the FOC
System shall be and remain in Lessee, provided, however, that

- 11 -

Lessee shall not encumber, voluntarily cause a lien to be placed upon, or otherwise act or fail to act with regard to, said facilities and equipment, if such encumbrance, lien, or action or failure to act would be inconsistent with, or in any way conflict with, Lessor's rights under this Agreement with respect to the Demised Premises during the term of this Agreement (including any renewals thereof) and upon termination of this Agreement.

6. Assignment and Sublease

6.1  Lessee shall not assign, sell, or transfer, for collateral or for any other purpose, all or any of its rights or obligations under this Agreement, or sublease all or any part of the Demised Premises without the prior written consent of Lessor, provided, however, that Lessee may, upon written notice to Lessor, assign this Agreement in whole or in part to any wholly-owned subsidiary of Lessee. Any purported assignment or sublease by Lessee shall not relieve Lessee of its obligations to pay rent and to comply (or ensure compliance) with all other terms of this Agreement.

6.2  Lessor shall have an unrestricted right to assign, for collateral or for any other purpose, all or part of its right to receive payments pursuant to the terms of this Agreement upon notice to Lessee, provided that the remaining obligations and/or rights of the Lessee are in no way affected by this assignment.

- 12 -

### 7.   Right-of-Way Operations

7.1  **Lessor** shall have full control at all times over the
railroad operations of Lessor and other railroads along the
Right-of-Way.  Nothing in this Agreement shall be construed to
permit or authorize in any way interference by Lessee with
railroad operations of Lessor or other railroads along the Right-
of-Way.  Lessor may, at its option, and at the **Lessee's** expense,
require that employees, agents, and contractors of **Lessee** who are
or will be involved in the construction, installation, operation,
and maintenance of the FOC System or the construction of the
Local Distribution System along the Right-of-Way be trained in
railroad safety matters via courses or materials to be offered or
specified by Lessor.

7.2  Nothing in this Agreement shall be construed to permit
or authorize in any way any interference by Lessee with any non-
railroad operation authorized over the Right-of-Way.

7.3  Lessee understands and agrees that the normal course of
railroad operations may involve construction, maintenance, demo-
lition, and similar activities that have the potential to cause
interruption to the services provided over the FOC System.
Lessor understands and agrees that reasonable precautions must be
taken by its personnel and agents to avoid such interruption, and
whenever possible Lessor will use its best efforts to notify
Lessee in advance of activities that might cause such
interruption.  When service over the FOC System is interrupted,
Lessee shall be entitled to take necessary emergency measures to
restore the FOC System.  The extent and nature of said necessary

emergency measures shall be subject to the approval of Lessor prior to the undertaking by Lessee of such emergency measures. Procedures for such emergency measures shall be agreed upon in writing by the parties prior to the initiation of operation of the FOC System.

7.4  Lessee shall notify Lessor in advance of Lessee's maintenance, repair and other activities requiring access to the Demised Premises, in order to coordinate said access by Lessee with railroad and other operations along the Right-of-Way.

7.5  The parties shall cooperate with each other and shall coordinate their activities in order to ensure that neither the FOC System construction, operation, and maintenance activities nor the construction of the Local Distribution System, as defined in the Communications Agreement between the parties, conflict with, and are inconsistent with, the duties and obligations of Lessor under Lessor's labor agreements with the Brotherhood of Railroad Signalmen, the International Brotherhood of Electrical Workers, and any other labor unions with which Lessor has or may have labor agreements, copies of which will be provided to Lessee on request.

7.6  Lessor shall have the right, in its sole discretion and at its sole expense, to require Lessee to relocate the FOC System or any part thereof upon reasonable notice to Lessee; provided, however, that such relocation shall be in Lessor's sole discretion but at Lessee's sole expense if such relocation is requested by Lessee or is due to any improper construction or location of any part of the FOC System by Lessee, as determined

- 14 -

by the Lessor; and provided further that such relocation shall be at Lessee's sole expense if such relocation is required or necessitated by action of any governmental authority, except where that authority is obtained at the request of Lessor, in which case it shall be at Lessor's sole expense.

7.7  Lessor shall have the right, in its sole discretion and at Lessee's sole expense, to require Lessee to relocate the Local Distribution System or any part thereof upon reasonable notice to Lessee if such relocation is due to any improper construction or location of any part of the Local Distribution System by Lessee, as determined by the Lessor.

8.  Termination

8.1  Except to the extent that specific termination provisions elsewhere in this Agreement apply, each of the following events shall constitute a "Default" under this Agreement:

(a)  Non-payment when due of rent or of any other amount which Lessee is obligated to pay pursuant to this Agreement;

(b)  Significant interference by Lessee with Right-of-Way activities or operations;

(c)  Commencement of construction prior to approval of plans, specifications, and timetables by Lessor pursuant to Section 16 hereof, or material variation from such plans,

- 15 -

specifications, or timetables without the written consent of Lessor;

(d)  Default by Lessee as to any of the representa-tions, warranties, or covenants of this Agreement;

(e)  Unauthorized use of the Demised Premises by Lessee.

8.2  If Lessor has not received any payment from Lessee within thirty (30) calendar days after the date on which payment is due, Lessor may notify Lessee in writing of Lessee's default and of Lessor's intention to terminate this Agreement ("Termination Notice"). (For purposes of this Paragraph, whenever Lessee is required by this Agreement to make payment "promptly," or when no time for payment is specified, the date on which payment is due shall be thirty (30) days after Lessee receives a demand for payment from Lessor.)  If payment is not received by Lessor from Lessee within ten (10) calendar days after Lessee receives said Termination Notice, this Agreement shall terminate, without the necessity for any further action by Lessor or further notice to Lessee.  If payment is received by Lessor from Lessee within ten (10) calendar days after Lessee receives said Termination Notice, this Agreement shall remain in full force and effect, as if Lessee had not been in default. Acceptance by Lessor of any payment received after Lessee receives said Termination Notice shall not constitute a waiver of Lessor's right to terminate this Agreement.

8.3  Upon the occurrence of any Default as defined in Paragraph 8.1 other than a Default involving nonpayment (as to

which Paragraph 8.2 governs), Lessor may give written notice to Lessee of Lessor's intention to terminate this Agreement, and Lessee shall then have a reasonable opportunity to cure the Default, to the extent it is possible to cure said Default. (For purposes of this Paragraph, thirty (30) days shall constitute the time period providing a "reasonable opportunity to cure," unless Lessor agrees that additional time is required.) Upon the failure of Lessee to cure after notice and reasonable opportunity to cure, this Agreement may be terminated at the option of Lessor, upon written notice to Lessee.

8.4  In addition to any other rights of Lessor to terminate this Agreement, Lessor may terminate this Agreement if Lessee shall become insolvent or bankrupt or cease to pay its debts as they mature (except to the extent said debts are the subject of a bona fide dispute), or makes a general assignment for the benefit of creditors, or commences a voluntary case under any bankruptcy, insolvency or other similar law, or if bankruptcy, insolvency or similar proceedings shall be instituted against Lessee or such corporation pursuant to the laws of any jurisdiction, provided, however, that if bankruptcy, insolvency, or similar proceedings are instituted against Lessee without the consent and against the wishes of Lessee, Lessee shall have a period of sixty (60) days from the date of the institution of such proceedings within which to seek its dismissal or otherwise to cure the default under this Paragraph, and no right of termination may be invoked under this Paragraph until the expiration of said sixty-day period.

8.5  In the event that this Agreement terminates because of a Default by Lessee or because Lessor has invoked the termination provisions of Paragraph 8.4, Lessor shall have an unqualified right to retain (as payment pursuant to this Agreement, and not as liquidated damages) the full amount of the payment or payments made by Lessee pursuant to the terms of this Agreement.

8.6  Upon termination of this Agreement for any reason (including termination by reason of expiration of the Initial Term or a Renewal Term without exercise of a renewal option), Lessee shall remove its equipment and facilities from the Demised Premises within three hundred and sixty five (365) days of such termination.  Any equipment or facilities left by Lessee after such period shall be deemed abandoned, and Lessor shall have the option either to retain such equipment or facilities as its own for such use as it sees fit, or to remove, or cause to be removed, such equipment and facilities.  Any costs, expenses, or damages incurred or suffered by Lessor as a result of removal of Lessee's equipment and facilities pursuant to this Paragraph, whether caused by Lessor or Lessee or an employee or agent or contractor of either, shall be paid by Lessee to Lessor promptly after Lessee receives demand for such payment from Lessor.

9.  <u>Insurance</u>

9.1  From and after the date of execution of this Agreement, and continuing for a period of two (2) years after the date on which this Agreement terminates, Lessee shall provide and

maintain in full force and effect a Railroad Protective Policy of insurance in the amount of Ten million dollars ($10,000,000) per occurrence, no aggregate, to protect Lessor, Lessor's employees, contractors of Lessor and Lessee, and Lessor's property against risks associated with construction, operation, and maintenance of the FOC System by Lessee and the construction and Warranty Year as defined in the Communications Agreement of the Local Distribution System by Lessee.  Lessee agrees to pay, promptly upon presentation of a statement or other instrument from the insurer setting forth the premium due, the initial premium and any and all renewal premiums necessary to obtain and maintain in full force and effect said Railroad Protective Policy.

Additional named insureds on the Railroad Protective Policy shall include Consolidated Rail Corporation, Delaware and Hudson Railway Company, Maryland State Railroad Administration, and Southeastern Pennsylvania Transportation Authority.  The Railroad Protective Policy must contain the following endorsements:

> A)   I.S.O. (Insurance Services Offices)
>
> Endorsement:- GL 00 30 03 83.

> B)   Manuscript endorsement with the following wording:
> "It is understood and agreed that:  Insuring
> Agreements, Section II, Definitions (c)(3) is
> amended to read:  'Any employee of the insured not
> within (1) or (2) who is specifically loaned or
> assigned to the work for contractor for prevention
> of accidents or protection of property regardless
> at whose cost those services are provided.'"

9.2 From and after the date of execution of this Agreement, Lessee will, at its sole cost and expense, keep and maintain policies of insurance as follows:

(a)    General Public Liability Insurance protecting and indemnifying Lessee and Lessor, and naming as additional insureds Lessor, Consolidated Rail Corporation, Delaware and Hudson Railway Company, Maryland State Railroad Administration, and Southeastern Pennsylvania Transportation Authority, against any and all claims for damages to person or property, environment or natural resources, or for loss of life or property occurring upon, in, or about the Demised Premises and the adjoining streets and passageways, such insurance to afford immediate protection, to the limit of not less than Ten million dollars ($10,000,000) combined single limit per occurrence, with a deductible of not more than Five hundred thousand dollars ($500,000). All rights of subrogation for claims paid under this policy shall be waived.

(b)    Workmen's Compensation Insurance protecting and indemnifying Lessee against any and all claims filed (except claims filed by employees of Lessor) under state or federal workmen's compensation laws against Lessee or Lessor, arising out of activities involving construction, operation and maintenance of the FOC System or the construction of the Local Distribution System.

(c)    Any other insurance required by federal, state or local law or regulation.

9.3    The amounts of insurance carried by Lessee pursuant to Paragraphs 9.1 and 9.2 hereof shall be increased, at Lessee's sole cost and expense, not less than once every five years during the term of this Agreement (including any Renewal Term hereof), said increased amount to be at least equivalent to the increase

over said five-year period in the Consumer Price Index for all
urban consumers and all items, U.S. City Average, 1967 Base of
100, issued by the Bureau of Labor Statistics of the United
States Department of Labor.

9.4  All insurance provided for in Paragraphs 9.1 and 9.2
herein, if readily attainable, shall be effected under standard
form policies issued by insurers of recognized responsibility,
authorized to do business in all of the states through which the
Right-of-Way passes, which are well-rated by national ratings
associations and which have been approved in writing by Lessor,
such approval not to be unreasonably withheld.  Lessee may
provide the insurance coverage required by Paragraph 9.2 under
so-called "blanket" insurance policies providing insurance with
respect to the Right-of-Way, the FOC System, during construction,
operation and maintenance of the FOC System, and during the
construction of the Local Distribution System as well as other
premises and activities of Lessee.

9.5  Upon the execution of this Agreement, and thereafter
not less than thirty (30) days prior to the expiration dates of
the expiring policies theretofore furnished pursuant to this
Section 9, Lessee shall deliver to Lessor originals or duplicate
originals of the insurance policies required hereunder, bearing
notations evidencing the payment of premiums or accompanied by
other evidence satisfactory to Lessor of such payment.  If
insurance is carried under "blanket" insurance policies,
appropriate certificates of such coverage shall be furnished by
Lessee in lieu of the original or duplicate original policies.

9.6  Each policy delivered hereunder shall, to the extent obtainable, contain an agreement by the issuer that such policy shall not be cancelled without at least thirty (30) days prior written notice to Lessor and to any mortgagee named in such policy.

10.  <u>Indemnification and Liability</u>

10.1  Without regard to negligence, fault or strict liability on the part of Lessor, its agents, contractors, or employees, Lessee agrees to defend, indemnify and hold Lessor harmless from and against any and all claims, damages, losses, liabilities, costs and expenses, including attorneys' fees, for:

(a)  Libel, slander, infringement of copyright, unfair competition or unauthorized use of any trademark, trade name, or service mark, arising out of the material, data, information or other content transmitted or received over the FOC System, or any other similar claim;

(b)  Any personal injury to, or death of, any person or persons, including without limitation agents or employees of the Lessor, and any loss, damage, defacement, or destruction of property, including without limitation any rolling stock or equipment owned, leased, or in the possession of Lessor, or owned, leased, or in the possession of any railroad, or any property owned, leased, or in the possession of any entity authorized to use the Right-of-Way, arising out of or incident to the presence, activities, operations, or actions of Lessee, its

property, agents, contractors, or employees on or about the Demised Premises; and

(c) Whether resulting from accidental and sudden occurrences or from nonaccidental and nonsudden occurrences, any injury or damage to the environment or natural resources on or off the Right-of-Way; any costs for investigation, removal, cleanup or remedial actions on or off the Right-of-Way resulting from the release or threatened release of any substance or material considered harmful or hazardous pursuant to any federal, state or local law or regulation; or any similar claim arising out of the presence, activities, operations or actions of Lessee, its property, agents, contractors, or employees on or about the Right-of-Way, including without limitation the generation, handling, storage, transportation, treatment or disposal of any substance or material considered harmful or hazardous pursuant to any federal, state or local law or regulation. As used in this Agreement, "environment" means any water, including without limitation navigable, surface, ground, or drinking water, land surface or subsurface strata, or ambient air. As used in this Agreement, "natural resources" means fish, wildlife, biota, or other similar resources.

10.2 Lessee shall be solely responsible for any settlement of or any damage to the Demised Premises for which Lessor may become liable, including but not limited to settlement of or damage to roadbed, tracks, facilities, shelters, structures, and appurtenances of Lessor, or damage to any property of any entity authorized to use the Right-of-Way, arising from or as a result

of the construction, installation and operation of the FOC System or the construction of the Local Distribution System.  Lessor shall have the right to repair, replace, restore, or correct any such settlement or damage at the sole cost and expense of Lessee.

10.3  Upon prompt, written notice by Lessor to Lessee of a filed claim or suit covered by Paragraph 10.1 or 10.2, Lessee shall promptly assume responsibility for the claim so covered or undertake the defense of any litigation on behalf of Lessor, its agents, contractors, and employees; hold Lessor harmless for any expense associated therewith; and promptly pay any settlement or final judgment not subject to appeal that may be agreed to by the parties or entered by a court.  Lessor agrees to cooperate with Lessee in connection with any claim or suit as to which Lessor provides notice pursuant to this Paragraph, and Lessor shall not settle or compromise any such claim or suit without the consent of Lessee.  If Lessor does settle or compromise any such claim or suit without the consent of Lessee, Lessor shall be solely responsible for the amount of any settlement therefor.

10.4  In the event that Lessee does not assume and meet its obligations under Paragraph 10.3 promptly upon receiving written notice from Lessor, Lessor may, at its option, make any expenditures or incur any obligations for the payment of money in connection with or arising out of the matters referred to in Paragraph 10.1 or 10.2, including but not limited to attorneys' fees.  Such sums paid or obligations incurred shall be paid promptly by Lessee upon the rendering of a statement to Lessee therefor.

- 24 -

10.5  The provisions of this Section 10 with regard to
indemnification and liability shall be effective to the extent,
and only to the extent, that there is not insurance available and
in effect under Section 9 of this Agreement sufficient to pay the
claims, damages, liabilities, costs, and expenses that Lessee
would otherwise be obligated to pay pursuant to the terms of this
Section 10.

11.  Governmental Approvals and Related Matters

11.1  Lessee shall obtain at its own cost and expense all
permits, licenses, and approvals required by any governmental
authority for the construction, operation, and use of the FOC
System and the construction of the Local Distribution System,
including but not limited to construction permits and common
carrier operating authority.  In accordance with the
Communications Agreement, Lessee is under no obligation to seek
review of any FCC order affecting the common carrier-status of
the Local Distribution System.

11.2.  Lessee agrees to obtain and continue in full force and
effect all permits, licenses, and approvals referred to in
Paragraph 11.1, and Lessor will cooperate with Lessee to the
extent necessary for Lessee to obtain such permits, licenses, and
approvals.

11.3  Lessee will take such steps as may be necessary to
prevent material interference caused by the FOC System and/or the
Local Distribution System to any other telecommunications
transmission systems located on or about the Demised Premises.

Any such interference shall be corrected promptly, and at the sole cost and expense of Lessee.

11.4  Lessee will ensure at all times that the design, construction, operation, and maintenance of the FOC System; the design and construction of the Local Distribution System; and Lessee's equipment comply with:  (a) sound electronic and engineering practices; (b) the engineering and safety rules and regulations imposed by any and all governmental authorities having jurisdiction over the FOC System, the Local Distribution System, or railroad operations, including but not limited to the Federal Communications Commission, the Federal Railroad Administration, and the Rural Electrification Administration; (c) appropriate standards of recognized industry and professional associations, including but not limited to, as applicable, the Safety Rules for the Installation and Maintenance of Electric Supply and Communications Lines, National Electrical Safety Code Handbook, Part 2; and (d) the published standards of Lessor for engineering and safety, pipeline occupancy, and wire, conduit and cable occupations, which published standards shall be made available to Lessee upon request.  The standards for design and construction with which the FOC System, the Local Distribution System, and Lessee's equipment must comply shall be those standards in effect at the start of construction.  The manner of, and the equipment and devices to be used for, any installation, relocation or removal of Lessee's equipment must be approved in writing by Lessor.

## 12.  Force Majeure

12.1  In the event either party shall be rendered unable in whole or in part by "force majeure" (as herein defined) to carry out any covenant, agreement, obligation or undertaking hereunder to be kept or performed by such party, other than to make payment of amounts due hereunder, such covenant, agreement, obligation or undertaking shall be suspended only as long as, and to the extent that, such force majeure shall prevent performance of such covenant, agreement, obligation or undertaking, and such default shall be remedied with all reasonable dispatch when performance is no longer prevented by such force majeure.  The term "force majeure" as employed in this Paragraph shall mean acts of God, fire, flood, or other catastrophes, national emergencies, insurrections, riots, wars, or other similar causes, not within the reasonable control of the party claiming force majeure and which by the exercise of due diligence or the payment of money such parties are unable to overcome.

## 13.  Exclusivity

13.1  Nothing in this Agreement shall be construed to limit the right of Lessor to lease or convey all or any portion of the Right-of-Way or the Demised Premises for any purpose whatsoever, provided, however, that such leases or conveyances shall not interfere with the Lessee's operation and maintenance of the FOC System.

14.  Notices

14.1  All notices, demands, requests, or other communications which may be or are required to be given, served, or sent by one party to the other party pursuant to this Agreement (except as otherwise specifically provided in this Agreement) shall be in writing and shall be hand-delivered or mailed by first-class, certified mail, postage prepaid, or by telex or telecopier transmissions confirmed promptly in writing by first-class, postage prepaid mail, addressed as follows:

    (a)  If to Lessor:

        Assistant Vice President
        Corporate Development
        National Railroad Passenger Corporation
        400 North Capitol Street, N. W.
        Washington, D. C. 20001

    (b)  If to Lessee:

        AT&T Communications
        G. A. Funk
        District Manager - Room A356
        3033 Chain Bridge Road
        Oakton, Virginia  22185

14.2  Either party may designate by notice in writing a new representative or address to which any notice, demand, request or communication made thereafter shall be so given, served or sent.

14.3  Each notice, demand, request, or communication which shall be sent in the manner described in Paragraph 14.1, shall be deemed sufficiently given, served, sent or received for all purposes at such time as it is delivered by mail to the addressee named above as to each party (with the return receipt or the delivery receipt being deemed conclusive evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

15. <u>Representations and Warranties</u>

15.1  Each party hereby represents to the other and warrants that:

(a)  It is a duly organized and validly existing business organization, it is in good standing under the laws of the jurisdiction where it is organized or (if not organized in any jurisdiction) under the laws of the jurisdiction that contains its principal place of business, and it is duly qualified to do business.

(b)  There is no litigation or governmental or administrative proceeding pending, or, to the best knowledge of the party, threatened against either the party or the real or personal property that the party is providing pursuant to this Agreement, the probable outcome of which could adversely affect the right or ability of the party to enter into this Agreement.

(c)  The execution and delivery by the party of this Agreement, and the performance of its obligations thereunder, have been duly authorized by all necessary action of the party's governing board or similarly delegated authority, and do not, and adherence by the party to this Agreement will not, violate any provision of law or of the party's by-laws or articles of incorporation or any material agreement or instrument which is binding on the party or by which it or its property is bound or affected, or any statute, order, judgment, decree, rule, or regulation of any court or governmental agency or body having jurisdiction over the party or the real or personal property being provided by the party pursuant to the terms of this

- 29 -

Agreement, or any franchise, license, or permit with respect to said real or personal property.

(d)  This Agreement is a legal, valid, and binding obligation of the party, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy or similar laws relating generally to enforcement of creditors' rights.

(e)  No authorization, approval, consent, or other order of, or registration with, any governmental authority is legally required for the execution and delivery by the party of this Agreement and the performance of its obligations thereunder, provided, however, that certain governmental authorities are represented on Lessor's Board of Directors, which must approve this Agreement.

15.2  Lessor represents and warrants that it has right, title, and interest in the Demised Premises sufficient to lease said Demised Premises in accordance with the terms of this Agreement, except to the extent indicated in Paragraph 1.8 herein.

16.  Construction of the FOC System

16.1  Before construction may begin of the FOC System, the Local Distribution System or of any part thereof, a survey of the Right-of-Way shall be conducted jointly by the parties, at the sole expense of Lessee, to determine the availability and suitability of the Right-of-Way for cable and repeater site installation, to identify the cable route, such route to be

marked by Lessor, and to identify sites for repeater shelters. No construction or installation of the FOC System, the Local Distribution System or of any part thereof may begin unless Lessor has approved Lessee's plans and specifications. Lessor shall review and respond to Lessee's construction plans within thirty (30) days of submission to Lessor. Any changes to Lessee's construction plans which are made at the request of the Lessor shall be reviewed and responded to within fifteen (15) days of submission to Lessor by Lessee. Lessee shall present Lessor with a timetable for the start and completion of construction, said timetable to include specific milepost references for the start and completion of the FOC System and the Local Distribution System. Lessee shall not commence construction until said timetable is approved in writing by Lessor. In addition, beginning one month prior to the start of construction of the FOC System and/or the Local Distribution System and continuing until construction is completed, Lessee shall present Lessor one month in advance with a schedule of construction for the subsequent month. As used in this Agreement, the "start of construction" shall mean the start of removal of the Cable, and the "completion of construction" shall mean the start of the end-to-end testing of the FOC System and acceptance by Amtrak of the Local Distribution System, as the case may be. Prior to the cable for the FOC System becoming operational, the parties shall agree in writing on the procedures to be used in maintaining this cable. The terms of Section 7 herein and this Paragraph shall govern such procedures.

- 31 -

16.2  **Lessor** agrees to deliver to Lessee, promptly upon request **therefor**, free of charge or cost except that Lessee shall pay all reproduction costs, the following items:

        (a)  Copies of route maps; and

        (b)  Copies of plan and profile drawings and engineering and architectural data heretofore prepared or compiled with respect to bridges, tunnels and other such engineering obstacles along the Demised Premises.

Lessor's sole obligation under this Paragraph shall be to provide documents, maps, drawings, and data in its existing files, and Lessor shall not be under any obligation to develop documents, maps, drawings, or data for Lessee except as specified in this Agreement.

16.3  Lessee and its designated employees, agents, and representatives shall have the right, from and after the date of execution of this Agreement, to enter onto any portion of the Demised Premises for the purpose of surveying and inspecting the same and performing engineering or other tests or studies necessary to the construction of the FOC System or the Local Distribution System.  Such activities shall be coordinated in advance with Lessor or its designated representative.

16.4  **Lessor** shall have the right to verify by inspection that the location of the work and the materials used in any construction and in any repair, alteration, renewal or removal of equipment or facilities are in compliance with the plans and specifications as approved by Lessor.  Lessor shall give Lessee

- 32 -

reasonable notice of such inspections, and Lessee may, at its option, designate a representative to accompany Lessor's representative on such inspections.

16.5  All construction plans and specifications shall comply with current railroad engineering standards and state and local laws regarding railroad crossings and occupancy of railroad right-of-way.  In constructing the FOC System and the Local Distribution System, Lessee agrees to comply with all applicable federal, state, and municipal laws, orders, rules, and regulations now or hereinafter enacted, and to assume all costs and expense and responsibility in connection therewith, without any liability whatsoever on the part of Lessor.

16.6  The construction, maintenance and installation of the FOC System and the cable of the Local Distribution System including, but not limited to, the preparation of the Right-of-Way and the cable of the Local Distribution System for installation of fiber optic cable, and including the removal of obstacles to direct burial of cable including the preparation of aerial or marine installations, shall be the sole responsibility of Lessee, provided, however, that it shall be Lessor's responsibility at Lessee's sole expense, to remove, obstacles except for the removal of the Cable, associated with railroad structures and facilities and to repair any damaged duct.  All costs of construction, maintenance and installation of the FOC System and all costs of construction and installation of the Local Distribution System as described in Paragraphs 1, 2, 3 and 4 of the Communications Agreement shall be borne by Lessee,

including without limitation survey or engineering fees, fees and
expenses provided for in a construction contract, the cost of
financing and/or purchasing all equipment used in the FOC System
and as described in Paragraphs 1, 2, 3 and 4 of the
Communications Agreement and all costs incurred by the Lessor to
make the Demised Premises available to Lessee.

16.7    During the course of Lessee's installation of FOC and
Local Distribution Systems, it may encounter places along the
Right-of-Way where there are obstacles and/or damaged ducts.  If
such a place is encountered by Lessee, Lessee agrees to cease
construction and/or installation at that place and to consult
with Lessor regarding the removal of the obstacle and/or the
repair of duct.  In no event shall Lessee cause or allow its own
employees or contractors to remove the obstacles and/or repair
duct, unless and until Lessee has secured the express written
consent of Lessor to such removal or such repair.

16.8    If at any time during the work of construction,
maintenance or repair of the FOC System or the construction of
the Local Distribution System, Lessor should in its sole
discretion deem flagmen, watchmen, communications/signalling
personnel, electric traction personnel, inspectors assigned to
construction crews, and/or other measures, including, but not
limited to, train rerouting, desirable or necessary to protect
its operations or property or its employees or other persons on
or near the Demised Premises, Lessor shall upon notice to Lessee
where such notice is feasible have the right to place such
personnel or take such measures, at the sole risk, cost, and

- 34 -

expense of Lessee.  Lessee hereby covenants and agrees to bear the full risk, cost, and expense thereof and to reimburse Lessor promptly upon receiving from Lessor an itemized, written demand for such reimbursement.  Lessor's failure to furnish such personnel or take such measures shall not relieve Lessee of any obligation or liability it might otherwise have assumed, and shall not give rise to any liability to Lessee on the part of Lessor.  Upon being notified that the personnel or measures referred to in the first sentence of this paragraph have been deemed desirable or necessary by Lessor, Lessee shall not commence or continue construction, maintenance or repair measures, as the case may be, unless and until such personnel or measures are in place.

16.9  All cranes, lifts, drilling equipment, or other machinery that are to be operated in the vicinity of Lessor's electrification and power transmission facilities in connection with construction of the FOC System or the Local Distribution System shall be electrically grounded as directed by Lessor.  The agents, employees, or contractors of Lessee that are operating such cranes, lifts, drilling equipment, or other machinery shall have no less than twelve (12) months experience in the operation of the machinery being used, and Lessee shall be prepared to certify the extent of said experience upon request therefor by Lessor or its designated representative.

16.10  If, during construction or maintenance of the FOC System or the construction of the Local Distribution System, Lessee, its agents, employees, or contractors discovers

- 35 -

scientific or historical artifacts, Lessee shall immediately
notify Lessor or its designated representative of said discovery
and shall protect such artifacts until identified and removed by
the appropriate authorities exercising jurisdiction.

16.11  Upon completion of construction, Lessee shall provide
to Lessor accurate maps and drawings sufficient to identify
clearly the FOC System and the Local Distribution System "as
built" in and adjacent to the Right-of-Way.

16.12  Lessee shall pay the actual fully-allocated costs
associated with the employment by Lessor of one management
employee, selected by Lessor, to supervise for Lessor the
construction and installation of the FOC System, such employee to
be employed by Lessor at Lessee's expense up to and including
Seventy-one thousand dollars ($71,000) per year for salary and
benefits until thirty (30) days after completion of construction
of the FOC System.  Such employee shall not be considered an
employee of Lessee for any purpose.

17.  Liaison and Arbitration

17.1  No later than thirty (30) days after the execution of
this Agreement, each of the parties shall send a letter to the
other party, designating individuals as points of contact at the
following levels:  officer for overall decisionmaking; officer
for dispute resolution; contact person for day-to-day corporate
contact and liaison; contact person for engineering and project
management; contact person for field construction; contact person
for daily operations and maintenance; and contact person for

disaster operations on a twenty-four hour basis. The same individual may be designated for more than one of the foregoing positions, and either party may change the name of any designated officer or contact person at any time by so informing the other party in writing.

17.2  Any dispute arising out of or relating to this Agreement shall be referred to arbitration and the arbitrator's decision shall be final and binding on the parties. In the event that the parties are unable to agree upon an arbitrator, or when an arbitrator fails or is unable to act, either party may apply to the Chief Judge of the United States District Court for the District of Columbia who shall appoint an arbitrator to hear a dispute. In resolving any dispute, the arbitrator shall utilize the rules of the American Arbitration Association. No arbitration shall be supervised by the American Arbitration Association.

18.  Miscellaneous Matters

18.1  By leasing Right-of-Way to Lessee, Lessor is not hereby establishing any joint undertaking, joint venture or partnership with Lessee, its agents, or contractors. Each party shall be deemed to be an independent contractor, and shall act solely for its own account.

18.2  Lessor shall have the right, but not the obligation, to cure any defaults by Lessee, at Lessee's expense, of its obligations pursuant to any loan agreements, governmental requirements, or any other matters regarding Lessee's

construction, maintenance, or operation of the FOC System or Lessee's construction of the Local Distribution System.

18.3  At the request of either party hereto, a memorandum of this Agreement, or the actual Agreement if required by local law, may be recorded among the land and personal property records of each state and county in which the Demised Premises are situated. The party requesting such recordation shall prepare all documentation and bear the cost of recordation.  The other party agrees to execute such memoranda and other documents and forms as may be needed to accomplish such recordation.

18.4  So long as Lessee makes the payments required hereunder and performs the other obligations required of Lessee hereunder, Lessee shall quietly and peacefully hold, occupy, use, and enjoy the Demised Premises and the FOC System, free of hindrance, molestation, or interference from Lessor or anyone claiming by, through, or under Lessor, except to the extent that Lessee's right to use and enjoy the Demised Premises and the FOC System may be limited or qualified by specific provisions elsewhere in this Agreement.

18.5  This Agreement constitutes the entire agreement between the parties and supersedes all previous oral or written understandings, agreements, commitments, or representations — concerning the subject matter of this Agreement.  This Agreement may not be changed, amended, or modified in any way, and none of its provisions may be waived, except as may be agreed to in a writing executed by Lessor and Lessee.

18.6  Neither the waiver by either of the parties hereto of
a breach of or a default under any of the provisions of this
Agreement, nor the failure of either of the parties, on one or
more occasions, to enforce any of the provisions of this
Agreement or to exercise any right or privilege hereunder shall
thereafter be construed as a waiver of any subsequent breach or
default of a similar nature, or as a waiver of any of such
provisions, rights, or privileges hereunder.

18.7  This Agreement shall be binding upon and shall inure
to the benefit of both parties hereto and their respective legal
representatives, successors and assigns.

18.8  This Agreement, the rights and obligation of the
parties hereto, and any claims or disputes relating thereto,
shall be governed by and construed in accordance with the laws of
the District of Columbia.

18.9  The Communications Agreement between the parties is
incorporated by reference herein.  To the extent applicable, the
terms of the Communications Agreement shall apply as terms and
conditions of this Agreement as fully as if they were set forth
herein.

18.10  To facilitate execution, this Agreement may be
executed in as many counterparts as may be required; and it shall
not be necessary that the signatures of, or on behalf of, each
party, or that the signatures of all persons required to bind any
party, appear on each counterpart; but it shall be sufficient
that the signature of, or on behalf of, each party, or that the
signatures of the persons required to bind any party, appear on

one or more of the counterparts.  All counterparts shall collectively constitute a single agreement.  It shall not be necessary in making proof of this Agreement to produce or account for more than a number of counterparts containing the respective signatures of, or on behalf of, all of the parties hereto.

18.11  All costs, fees, and expenses arising out of any proceeding to enforce any of the terms hereof shall be borne by party ultimately found to have defaulted under the performance of this Agreement.

18.12  Section headings and tables of contents contained in this Agreement are inserted for convenience of reference only, shall not be deemed to be a part of this Agreement for any purpose, and shall not in any way define or affect the meaning, construction, or scope of any of the provisions hereof.

18.13  In case the whole or any part of the Demised Premises shall at any time during the term of this Agreement be taken by any public authority for any public use, the obligations and liabilities of Lessee under this Agreement shall continue in all respects notwithstanding such taking for public use, and Lessee shall not claim or be entitled to any part of the award to be made for damages for such taking, except to the extent relocation expenses for the FOC System are specified and actually awarded. Such taking for public use shall not be deemed a breach of the Lessor's covenant for quiet enjoyment as set forth in Paragraph 18.4 herein.  If, however, after such a taking Lessor does not make available to Lessee the opportunity to relocate, at Lessee's sole expense, along the Right-of-Way that portion of the

- 40 -

FOC System so taken, Lessee shall become entitled to a rebate in the rental payment equal to:  a.) the product of the number of miles of the Right-of-Way so taken multiplied by Fourteen thousand one hundred eighty-five dollars ($14,185) multiplied by the number of years remaining in the lease term of the Agreement; b.) divided by twenty (20) years.

18.14  If any part of this Agreement is determined to be invalid, illegal or unenforceable, such determination shall not affect the validity, legality or enforceability of any other part of this Agreement and the remaining parts of this Agreement shall be enforced as if such invalid, illegal or unenforceable part were not contained herein.

IN WITNESS WHEREOF, the undersigned have cause this Lease Agreement to be duly executed on their behalf as of the day and year first hereinabove set forth.


[Corporate Seal]

ATTEST:

_Arnold D. Cox_
_Assistant Corporate Secretary_

NATIONAL RAILROAD PASSENGER CORPORATION

By: _William S. Norman_

Title: Executive Vice President - Marketing & Business Development


[Corporate Seal]

ATTEST:

_Wilma McCarey_

AT&T COMMUNICATIONS, INC., Agent for Its Affiliated Interexchange Carriers and the Ameri Telephone & Telegraph Company - Interstate Divi

By: _Frank Blum_

Title: Executive Vice President-Network

- 41 -